UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| **PUBLIC CITIZEN** and the **SIERRA CLUB**, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | Civil Action No. 5:05-cv-00039-DF |
| **AMERICAN ELECTRIC POWER COMPANY, INC.,** and **SOUTHWESTERN ELECTRIC POWER COMPANY, INC.,** | § § § § § | |
| Defendants. | | |

### PLAINTIFFS' REPLY TO DEFENDANTS' APRIL 21ST RESPONSE TO PLAINTIFF'S SUMMARY JUDGMENT MOTION

TO THE HONORABLE JUDGE FOLSOM:

Plaintiffs, here, reply to arguments presented in "Defendants' Response in Opposition to Plaintiffs' Motion for Declaratory Judgment and Partial Summary Judgment on Claims I, II and IV."

**Summary of the Reply**

The following paragraphs point out that there are a number of preliminary decisions the Court could make that would streamline this litigation. One of these is plainly appropriate for a conventional partial summary judgment: are the 196 opacity exceedances identified by Plaintiffs (from Defendants' reports) permit violations by Defendants? Other decisions Plaintiffs seek would almost indisputably move the litigation to a more rapid conclusion, but Defendants urge the Court not to address these,

1

because doing so will not, alone, resolve any claim in Plaintiffs' petition. Defendants have some case law support (and there is also conflicting case law) for the proposition Plaintiffs' Motion was, at least, mis-titled. Plaintiffs continue to urge rulings on these less-than-dispositive issues, because they have been well-briefed and doing so is within the Court's power and doing so would speed the case along.

On the heat rate issue, Plaintiffs reassert that heat rate is a standard or limitation to which Defendants were bound by their PSD permit. Plaintiffs challenge the relevance of Defendants' "evidence" of what ex-TCEQ employees think the permit writer would have said, had he or she intended the permit term to be a standard or limitation. Plaintiffs also challenge the legitimacy of Defendants' attempts to redefine what they said (swore to, actually) at an earlier time regarding heat rate. Plaintiffs point out a couple of Defendants' own statements, not disavowed, that highlight why heat input rate is a standard or limitation for operation of the units; heat rate may not be well-correlated with NOx or $SO_2$ emission, which are not in question, here, and it is well-correlated with PM emissions, which are in question in this case.

On the "front-half" and "back-half" PM emissions issue, Plaintiffs mostly point out that the Texas law is not ambiguous or newly-formed, and Defendants are charged, like everyone else, with knowing it and following it.

On the matter of whether Plaintiffs may show NSPS opacity violations using Defendants' continuous opacity monitoring data or must rely on only "Method 9" data, Plaintiffs point out that the Clean Air Act amendments in 1990 cleared up that question,

if in fact it really existed, by declaring that violations may be proved by any "credible evidence."

Plaintiffs, finally, explain their entitlement to a true partial summary judgment on the 196 opacity exceedances they highlighted in their Motion and that Defendants had not, until their Response – and, then, only by argument, not by evidence – indicated were startup or shutdown exceedances. Plaintiffs also attempt to more sharply focus the apparently emerging issue of whether startup and shutdown periods may be orchestrated to "cover" excess routine maintenance emissions, for which the NSPS do not allow an exemption.

### The Procedural Attacks

Plaintiffs seek a declaration that heat rate, which is an operating variable for which a maximum value is set by Defendants' PSD permit, is a "standard or limitation," as that phrase is used in the Clean Air Act. The heat rate stated in the permit and, thus, incorporated in the Title V permit has been often exceeded; the dispute here is as to the legal consequence of that. Therefore, the "standard or limitation" or otherwise character of the stated heat rate is important, and knowing the Court's view on that would plainly help the parties move through this case more expeditiously.

The PSD permit sets what all parties agree is a standard or limitation for particulate ("PM") emissions. The point of contention is as to how to measure

compliance with that standard or limitation.[1]  Knowing the Court's view on this issue, also, would plainly help the parties intelligently move the case to a conclusion.

Defendants' opacity standards or limitations derive from both the Texas SIP opacity requirements and the federal NSPS opacity requirements.  These two are not the same.  The latter excuses automatically a 6-minute/hour exceedance in the 20%-27% range, while the SIP rules do not; Plaintiffs think Defendants are bound by their PSD permit to adhere to the SIP opacity-exceedance rules where these are more stringent than the NSPS requirements; it is not clear that Defendants agree on this point of law.  Similarly, Plaintiffs don't think the NSPS rules allow an exclusion (from "violation") for excess emissions that occur during periods of routine maintenance.  Defendants reported exceedances during periods of routine maintenance, but now appear to argue that routine maintenance emissions are exempt because they may be dual-characterized as occurring during a generously-defined startup/shutdown period.  Again, it is obvious all concerned would benefit from an understanding of the Court's position on these disagreements.

Defendants have fully briefed the foregoing points of dispute.  Nonetheless, their Response argues Plaintiffs are not entitled to seek partial summary judgments or declaratory judgments on any of these issues.  Defendants correctly point out that, with the exception of Plaintiffs' request for judgment on the 196 routine maintenance opacity

---

[1] At the time the permits were initially issued, EPA was the issuing authority, and EPA customarily measured PM emissions by weighing only the "front half" particles caught in filters.  However, as Defendants are eager in other contexts to point out, Texas has become, since the time the permits were issued, the primary agency for PSD permit issuance, renewal and enforcement.  Texas has long measured compliance with PM standards and limitations by considering both the filterable ("front half") and the condensable ("back half") particles; in 1988 TCEQ adopted regulations formally codifying this practice.  Plaintiffs argue Defendants are charged with keeping abreast of changes in the law, so should have sought changes in their PM standard or limitation, if they did not intend to comply with the standard measured the way TCEQ measures it.

exceedances, Plaintiffs' requests for rulings, alone, do not establish Defendants' liability on any of Plaintiffs' claims. Basically, Defendants call Plaintiffs to task for not properly characterizing the pleading Plaintiffs filed.

Defendants do not, and, really, could not argue that the Court lacks jurisdiction to announce its view of the law on the points of law that are in contention in the case. Rule 56(a) clearly allows a party to move for summary judgment upon all *or any part of* a claim. Fed. R. Civ. P. 56(a); *France Stone Co. v. Charter Township of Monroe*, 790 F. Supp. 707, 710 (E.D. Mich. 1992) (granting plaintiff's motion for partial summary judgment on one issue of one of plaintiff's claims). And under Rule 56(d), the trial court may issue an order specifying the facts that appear without substantial controversy. Fed. R. Civ. P. 56(d).[2] It would be hard for anyone to argue that resolution of these points would <u>not</u> facilitate getting this case resolved.[3] So, Plaintiffs, their inartful pleading notwithstanding, urge the Court to resolve the legal issues presented by the pleadings (and, of course, actually enter a partial summary judgment in Plaintiffs' favor on the 196 alleged violations that do qualify for summary judgment).

### Heat Input (Claim I)

<u>Language of limitation</u>.   Defendants argue TCEQ would use the language "shall not exceed" or something similar in describing the heat rate, if heat rate were a standard

---

[2] *See also Archer-Daniels-Midland Co. v. Phoenix Assur. Co.*, 936 F. Supp. 534, 536-537 (SD Ill. 1996) ("Whereas a grant of partial summary judgment may not resolve a separate claim for purposes of Rule 54(b), it is an appropriate mechanism for resolving issues prior to trial. Therefore, there is nothing improper in attempting to resolve such issues by seeking partial summary judgment."); *Dooley v. Liberty Mut. Ins. Co.*, 307 F. Supp. 2d 234, 240 (D. Mass. 2004) (allowing partial summary adjudication as to specific issues to narrow them before trial).

[3] The advisory committee notes following the rule explain that a Rule 56(d) adjudication serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact. Fed. R. Civ. P. 56 advisory committee's note.

or limitation. For this proposition, Defendants rely on two affidavits from ex-TCEQ employees who opine to this effect. These witnesses offer circumstantial evidence of the intent of someone else, the TCEQ permit writer, in drafting the PSD permit. Clearly, neither of these individuals could know of first-hand knowledge what the permit writer was thinking, so their conclusions as to what the permit writer would have written, had he or she intended heat rate to be a permit term, should be stricken.

More significantly, there is an important public-involvement component to permitting. If that component is to be of value, the permit-writer has to be explicit, if language that appears for all the world to be a permit term is not, in fact, intended to be a permit term. Defendants should not be allowed to come in now, 25-30 years down the road, and attempt to prove the permit writer was thinking something other than what he or she wrote.

Mr. Blanchard's admission. Defendants, footnote 11, attempt to avoid the party declaration of Mr. Blanchard that 5156 MMBTU/hour is a permit "maximum" rate by (implicitly) demoting the word "maximum" to pure surplusage. The PM emission rate, 515.6 lb/hour, is "0.1 lb/MMBTU of heat input" times a "5156 MMBTU/hour heat rate." In writing to TCEQ, Mr. Blanchard put the word "maximum" in front of the heat rate value, not to make his statement of the basis of the particulate emission rate true, as it would have been true without the word "maximum," but, rather, because the permit defined that value of heat rate as the maximum rate that was allowed. As all parties acknowledge, the units are physically capable of achieving much higher heat rates than

6

5156 MMBTU/hour; it would make no sense to modify "heat rate" with the adjective "maximum," were it not for the fact of the regulatory – not physical – limitation.

    <u>The emissions significance of heat rate</u>.  Defendants include two affidavits and what appears to be one of 11 pages to a TCEQ investigation report (Gaus Aff., Att. F) that indicate that NOx and $SO_2$ emissions do not vary linearly with heat rate.  From this fact, Defendants argue heat rate has no bearing on any emissions (not just NOx and $SO_2$ emissions), so it would be irrational to characterize heat rate as an emission standard or limitation.  This extreme conclusion is refuted by, among a number of other pieces of summary judgment evidence, Defendants' Exh. 12.  That exhibit, a 1994 SWEPCO letter, states (emphasis added):  "the maximum design heat input of the unit is 5,156 mmBtu/hr.  *This value will be used in order to appropriately calculate maximum emission rates* in lbs/hr. and tons/year."  Both the Olson and Myers affidavits (¶¶ 10 and 12, respectively) state that higher permitted heat rates would have resulted in higher permitted emission rates.

    <u>Mr. Franklin's compliance certification admission</u>.  In April 2004, a Title V permit compliance certification was submitted to TCEQ, listing, as an item of permit non-compliance, "exceed heat input value due to change in heat rate since construction."  This certification was signed by Mr. Franklin.  Exh. F to Plaintiffs' Motion.  He went on to explain the company's corrective action would be to "revise or amend permit PSD-TX-3/4381."  *Id*.

    In his affidavit accompanying Defendants' Response, he now certifies that he did not know what he was signing and that the facts stated in the compliance certification are

not the company's present position and that those facts represent, instead, only the view of a subordinate, Mr. Wilson.

Mr. Franklin's compliance certification responsibilities are described at 40 CFR § 70.5(d):

> Any application, form, report, or compliance certification submitted pursuant to these regulations shall contain certification by a responsible official of truth, accuracy, and completeness. This certification and any other certification required under this part shall state that, based on information and belief after reasonable inquiry, the statement and information contained in this document are true, accurate and complete.

Mr. Franklin had a duty to make reasonable inquiry as to the truth of the matters as to which he swore, and he should not now be heard to say he did not do that and what he swore to was really just the mistaken understanding of a subordinate.

<u>Hearsay statement of TCEQ position</u>.  Defendants rely repeatedly on the alleged comments of "an attorney for TCEQ assigned to the case" for the "fact" that TCEQ no longer considers the 5156 MMBTU/hour heat rate a "limit" (presumably, a permit limit) for the plant.  This comment – the out-of-court statement of a non-party – is rank hearsay and is not admissible summary judgment evidence and should not be considered, here.

### Particulate Matter (Claim II)

Defendants argue that whether their PM emissions comply with their permit must be determined by the measurement method used by EPA at the time their PSD permits were initially issued.  Defendants acknowledge that their permits for many years have been, and now their permit is, amended, renewed, enforced and the like by TCEQ. Defendants do not dispute that TCEQ has had since 1988 a regulation that

unambiguously defines PM emissions as incorporating both filterable and condensable particles that are not captured through Method 5 sampling---a departure from the method EPA used in the 1980 timeframe. Despite more or less continuous contact with TCEQ regarding one aspect or another of their various air quality permits, Defendants only recently sought to revise or amend the PM emission limits in their PSD permits to make those limits more easily achievable under the TCEQ's PM compliance regulation.

Defendants, like all the rest of us, are charged with knowing what the law is and with conforming their actions to the law. We are now many years into the regimen in which a person looks, for example, at a Title V operating permit for a Texas facility and sees a certain PM limit and knows that limit describes both the front and back half particulate emissions "catch" – it is total PM emissions. Defendants should not be allowed to thwart that common understanding, the understanding codified in regulation, by invoking a theory of implicit vintaging of legal definitions.

**Opacity (Claim IV)**

<u>Regarding the automatically-claimed 6-minute exceedances</u>: Defendants claim Plaintiffs may not have a ruling that the PSD permit and SIP provisions preclude Defendants' routine claim of one 6-minute, 20%-27% opacity exceedance/hour. Defendants claim the exceedances could have been, for example, for precipitator rapping and could have aggregated less than 6 hours in a 10-day period (thus, falling within the exclusion of the PSD permit and SIP provisions).

Defendants' argument, ultimately, is that Plaintiffs had the burden to disprove defenses Defendants might – but in response to Plaintiffs' motion did not – assert. This

is not the law. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994) (if moving party meets its initial burden, nonmovant must go beyond pleadings and designate specific facts showing there is genuine issue for trial; this burden is not satisfied with "some metaphysical doubt as to the material facts," or by "unsubstantiated assertions," or by only a "scintilla" of evidence). Defendants can not defeat an adverse ruling merely by asserting the exceedances could have been caused by precipitator rapping, for example, that did not exceed six hours in 10 days.

If the Court determines that there is no automatic 6-minute exemption available for opacity exceedances under the SIP and, hence, PSD permit opacity limits, then, Defendants will have the opportunity to come in with evidence that the exceedances are subject to the mitigating circumstances outlined in the SIP.

<u>Regarding the 196 specific opacity exceedances.</u>  Plaintiffs identified 196 instances of opacity exceedances spread over 5 of the 20 quarters within the limitations period of their claim. These exceedances occurred during routine maintenance activities. Defendants brought forward no evidence controverting the affidavit-and-document-supported fact that the 196 opacity exceedances occurred during routine maintenance; in fact, Defendants' Response concedes as much.

<u>The credible evidence rule</u>.  Defendants argue, however, that Plaintiffs must demonstrate violation of NSPS opacity limitations by reliance on "Method 9." That has not been the law since at least the Clean Act Amendments of 1990. 40 CFR § 60.11(g), adopted pursuant to the 1990 amendments, allows the use of any credible evidence to

establish a violation.  EPA, in its preamble language to the "credible evidence rule" adoption, explained this quite clearly:

> In private lawsuits such as contract disputes, and in governmental and citizen enforcement actions brought under environmental laws other than the CAA, litigants can and do use a wide variety of information to prove their claims, or to refute the claims of opposing parties. . . . Today's final rule addresses problems arising from certain CAA regulations, which predate the 1990 Amendments to the CAA, containing language that has been read to allow only a very limited amount of information, i.e., data from reference test methods, to be used as evidence of violations. As such, the rule merely corrects an anomaly that has been read into these regulations, and brings their potential enforcement into line with that of other CAA requirements such as the "general duty obligations" in 40 CFR § 60.11(d) (for NSPS standards) and 40 CFR § 61.22(c) (for National Emission Standards for Hazardous Air Pollutants (NESHAPs)), and with other environmental statutes.   62 Fed. Reg. 8314, 8317 (Feb. 24, 1997).

The rule is explicitly applicable to NSPS opacity determinations:

> (g) For the purpose of submitting compliance certifications or establishing whether or not a person has violated or is in violation of any standard in this part, nothing in this part shall preclude the use, including the exclusive use, of any credible evidence or information, relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test or procedure had been performed.  40 CFR § 60.11(g).

Defendants, in Response footnote 26, cryptically challenge this provision "as applied in the context of this citizens suit."  Defendants' reasoning appears, from Defendants' case law citations, to be that increasing the accuracy of the allowed detection method (i.e., allowing COMs data, rather than solely Method 9 data, to establish whether or not a violation occurs) actually increases the stringency of the standard for which compliance is being detected and that an agency cannot do that without conducting a new rulemaking on the standard, itself (i.e., in this case, the 20% NSPS opacity standard).

EPA explicitly rejected this argument in its "credible evidence" rulemaking:

> Industry commenters have argued that the stringency of emission standards will be increased if enforceable data is obtained more frequently than has been ordinarily obtained in the past through reference testing. . . .
>
> Because the NSPS and NESHAP emission standards must be met continuously, consistent with any averaging times and except during periods where compliance is specifically excused, any more frequent or continuous monitoring of the standards and any enforcement based on violations uncovered thereby have no effect on the stringency of the standards. To take a simple analogy, allowing the use of radar guns or increasing the number of police checking for speeding may raise the chance that a speeder will be detected, but this does not alter the legal stringency of a posted speed limit. 62 Fed. Reg. 8314, 8326 (Feb. 24, 1997).

The Eleventh Circuit, in an opacity case, has joined EPA in rejecting the argument:

> Similarly, although using COMS data to determine violations of the 20% opacity limitation increases the likelihood that pollution violators will be detected, it does not alter the posted emission limit. The Clean Air Act does not assume an accepted level of undetected non-compliance; it provides that there is to be continuous compliance with pollution limitations. See 42 U.S.C. § 7602(k) ("The terms 'emission limitation' and 'emission standard' mean a requirement . . . which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis . . . .").

*Sierra Club vs. Tennessee Valley Authority*, 430 F.3d 1337, 1348 (11th Cir. 2005).

<u>Regarding NSPS and routine maintenance emissions during "shutdown."</u> Defendants filed excess emission reports (see, Exh. E to Plaintiffs' Motion) characterizing periods of excess emissions as associated with "start up/shut down" and various other activities, such as "other known causes – boiler grit blast." Now, however, Defendants argue that unspecified instances of these other activities, instances that were not initially reported as associated with "start up/shut down," nonetheless, were

12

associated with startup or shutdown. Defendants did not join the issue as to the 196 exceedances challenged by Plaintiffs (since these exceedances had been reported by Defendants as other than startup or shutdown exceedances), because Defendants did not identify the ones, if any, they now claim were, in fact, startup or shutdown exceedances. Rather, Defendants simply assert that because their interpretation of the law incorporates startup/shutdown in routine maintenance, they have adequately challenged Plaintiffs' uncontroverted facts, even though they have proffered no factual evidence whatsoever.[4]

Excess emissions occurring during routine maintenance activities have never been excused by EPA from NSPS violation, but Defendants claim TCEQ had the authority and, in fact, did interpret the NSPS regulations differently from EPA's interpretation and that this TCEQ interpretation superseded EPA's in Texas.

Defendants cite, for this proposition, an Eleventh Circuit case, *Sierra Club, et al., v. Georgia Power Co.*, 443 F.3d 1346 (11th Cir. 2006). That case involved a citizen suit challenge to Georgia Power's exceedances <u>of a state SIP opacity provision</u>. It did not address NSPS interpretations. It stands for the fairly conventional proposition that EPA may not by guidance or interpretation of its regulations alter an EPA-approved SIP; there is a process for SIP alteration, and it must be followed.

That is not the situation at hand, here. Here, Plaintiffs allege violations of NSPS opacity provisions, provisions that explicitly do not allow exceptions for exceedances that occur during periods of routine maintenance.

---

[4]    Such evidence would not only be helpful, but is essential, as Defendants have acknowledged that routine maintenance also occurs during routine operations. See Exh. 4 to Defendants' Response.

TCEQ has endorsed the "shutdown" interpretation that Defendants champion (although TCEQ has never specifically applied this general policy to the facts presented here). (See, Att. A to the Gaus affidavit.) However, as the guidance[5] cited by Defendant acknowledges, EPA has established different policies regarding the latitude accorded states in interpreting, on the one hand, the NSPS and, on the other hand, the NESHAPS ("National Emission Standards for Hazardous Air Pollutants"). As explained by the guidance (p. 19):

> The 1980's guidance [i.e., the NSPS guidance] recommended that State or Local Agencies perform only routine applicability determinations based on an established precedent. The Part 63 guidance contains no such limitation on State or Local authority.

("Part 63 guidance" is guidance regarding alternative monitoring options for NESHAPS.)

The rationale set forth both in the 1998 guidance cited by Defendants and, now, by Plaintiffs and in the 1980 guidance to which the 1998 guidance refers for according states relatively less discretion regarding applicability determinations related to the NSPS is the need for a degree of uniformity nationally regarding interpretation of the NSPS. The interpretation advocated by Defendants and endorsed by TCEQ is opposed to this logical and laudable objective. It would carve out a new, Texas-only exemption for opacity exceedances that occur under the cover of cessation of operations, even if the exceedances were associated with routine maintenance. The court should not

---

[5] "How to Review and Issue Clean Air Act Applicability Determinations and Alternative Monitoring of New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants" (EPA, 1999: 305-B-99-004).

countenance this new exemption. If the maintenance is foreseeable, as routine maintenance is, its emissions should be held to permitted limits, which, in this case, means "should be held to 20% opacity."

## CONCLUSION

Based on the foregoing and on Plaintiffs' Motion for Declaratory Judgment and Partial Summary Judgment, Plaintiffs respectfully request that all relief requested be granted.

DATED: May 15, 2006

Respectfully Submitted,

By: /s/ David Frederick

DAVID O. FREDERICK,

Lead Attorney
Texas Bar No. 07412300
Lowerre and Frederick
44 East Avenue, Suite 100
Austin, TX 78701
512.469.6000
512.482.9346 (facsimile)

COUNSEL FOR PLAINTIFFS SIERRA CLUB AND PUBLIC CITIZEN

## CERTIFICATE OF SERVICE

By my signature, above, I hereby certify that on May 15, 2006, the foregoing was electronically served using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF Registrant indicated below. A copy of a proposed order was served by the same means.

**Mr. Stayton L. Worthington**
Coghlan Crowson et al
1127 Judson Rd, Ste 211
P.O. Box 2665
Longview, TX 75606-2665
903/758-5543
903/753-6989 (fax)
bworthington@ccfww.com