**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS,
TEXARKANA DIVISION**

|  |  |  |
|---|---|---|
| PUBLIC CITIZEN and the SIERRA CLUB, | § § § § § § § § § § § § § § | |
| Plaintiffs, | | |
| v. | | CIVIL ACTION NO. 5:05-cv-00039DF |
| AMERICAN ELECTRIC POWER COMPANY, INC., and SOUTHWESTERN ELECTRIC POWER COMPANY, INC., | | |
| Defendants, | | |

**PLAINTIFFS' RESPONSE TO "DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' THIRD AND FIFTH CLAIMS FOR RELIEF AND BRIEF
IN SUPPORT"**

### Introduction

Defendants state correctly the procedural predicates for its motion and this

response. Defendants generally state correctly the pertinent law regarding the PSD

("Prevention of Significant Deterioration") and Title V Clean Air Act programs and the

role of the State Implementation Plan in establishing state-created but federally-

enforceable obligations and defenses for, among others, owners and operators of major

emitting facilities, such as large power plants.

The Court, additionally, should be aware that the Clean Air Act was amended in

1990 to explicitly allow, unlike the other environmental protection statutes with "citizen

suit" provisions, suits for a past PSD permit violation, "if there is evidence that the

alleged violation has been repeated." 42 U.S.C. § 7604(a)(3). The Court should also be

1

aware the pollution control project standard permit rule on which Defendants rely to

support their standing and mootness arguments related to Plaintiffs' Claim Three (i.e., the

carbon monoxide, "CO," claim) has not been approved by EPA to the Texas SIP and

emissions allowed by it are not, therefore, federally sanctioned.  See, the Texas SIP, 40

CFR § 52.2270(c).

### Claim Three

Defendants urge Plaintiffs' third claim, the claim related to carbon monoxide

("CO") emission exceedances at Unit No. 2, be dismissed for mootness, lack of Article

III standing, want of Clean Air Act authorization and insufficiency of the pre-suit notice.

The first three arguments turn on the significance of the TCEQ's ("Texas Commission on

Environmental Quality's") December 2004 approval of Defendants operation of Unit No.

2 under a "standard permit" for pollution-control projects; this standard permit approval

was made without compliance with PSD permitting requirements and purports to

authorize an approximately 20-fold increase in CO emissions from Unit No. 2.

The standard permit is not federally-approved.  This standard permit, a rule,

actually, has not been approved by EPA into the Texas SIP.  40 CFR § 52.2270(c) lists

the various state regulations that are EPA-approved and in the Texas SIP and, thereby,

made part of the PSD, Nonattainment Review or other federal Clean Air Act programs

Texas may implement.  As a review of 40 CFR § 52.2270(c) reflects, 30 TAC §116.617,

the regulatory statement of the standard permit for pollution control projects, is not

among the regulations EPA has approved.  Thus, regardless of whether Defendants have

a defense, *via* the standard permit, to a state enforcement action for CO emissions in

excess of the limit set out the 1998 permit (i.e., set out in permit no. 4381/PSD-TX-3),

they do not have a defense to a federal citizen suit enforcement action for such emissions.

<u>The exception embodied in the standard permit violates the Clean Air Act</u>.  EPA

approval to the SIP of 30 TAC § 116.617 (i.e., of the standard permit rule) cannot legally

happen in the future, either, at least so long as the standard permit continues to allow

significant increases in criteria pollutants, such as CO, at major emitting facilities without

requiring their compliance with the notice, public participation and BACT-analysis

provisions of the PSD program.  The DC Circuit Court of Appeals vacated last year the

federal rule that was the federal analog for TCEQ's rule establishing its pollution control

project standard permit.  *State of New York, et al., v. U.S. Environmental Protection

Agency, et al.*, 413 F.3d 3, 40-43 (D.C. Cir. 2005).

*State of New York* vacated both the then-new (i.e., 2002) version of EPA's rule

excluding pollution control projects from NSR (such as, PSD) review and the 1992

version of the rule, the version the 2002 version would have superseded.  *Id.*, at 42-43.

The vacated 1992 rule had applied to electric utilities, only. *See* 57 Fed. Reg. at 32,336-

37 (codified as amended at 40 C.F.R. §§ 52.21(b)(2)(iii)(h), 52.21(b)(32)(1992)).  The

Court of Appeals rejected EPA's assertion it (or, by implication, TCEQ) enjoyed

discretion under the Clean Air Act to exempt nominally environmentally-beneficial

modifications, such as pollution control projects with large ancillary impacts,[1] from NSR

review.

---

[1]     Much-increased CO emissions, in our case.

Alternatively, regarding standing and mootness. In the event this Court determines the state's approval of Defendants' operation of Unit No. 2 under the 30 TAC §116.617 standard permit in some manner insulates Defendants from the injunctive relief, penalties for past CO emission violations would still be available. Because payment of those penalties would tend to sharpen Defendants' attention on other PSD permit emission limits and reporting requirements, one would expect the other harms of which Plaintiffs complain (e.g., those from excess PM and sulfur emissions) to be in part addressed by the imposition of penalties for CO exceedances. Following *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 187 (2000), it is clear that penalties, though paid to the U.S. Treasury, may supply the redress Plaintiffs need to maintain Article III standing. Given the *State of New York* decision, it is not "absolutely clear" that past CO exceedances (as compared to the PSD permit limits) will remain defensible or that future indefensible exceedances can not reasonably be expected to recur. Thus, the definitiveness required to support Defendants' mootness arguments is lacking, as well.

CO exceedances are PSD permit violations and need not be noticed before suit. As is set out at more length, below, regarding the need or lack thereof for pre-suit notice of Claim Five, Plaintiffs were not required to give pre-suit notice at all for alleged violations of the PSD permit's terms. Carbon monoxide is a criteria pollutant (thus, subject to PSD permitting), Defendant SWEPCO represented to EPA certain CO emissions levels in its 1978 supplemental PSD permit application materials,[2] and the

---

[2]     See the Frederick Affidavit accompanying this response. It sets authenticates certain of Defendants' discovery responses, among them pages SWEPCO 00251 and 00254, which pages reflect some of SWEPCO's permit application CO representations.

1998 permit that is designated 4381/PSD-TX-3 certainly sets out CO limits for, among other units, Unit No. 2.  Under these circumstances, and Defendants' reliance on the 1976 and 1978 EPA letters notwithstanding, the limitation on Unit No. 2 CO emissions is a PSD permit limitation, for the violation of which no pre-suit notice is required.

Pre-suit notice Deficiencies.  In the event the Court turns to the merits of Defendants' criticisms of the quality of the pre-suit notice they received, Plaintiffs' responsive argument is as follows.

In Defendants' view, a pre-suit notice letter under the Clean Air Act must identify every detail of every alleged violation, before the letter may be considered adequate. This position conflicts with the express language of the notice requirement, the holdings of several courts and the basic principles underlying the pre-suit notice requirement.

Defendants, in this re-filed motion to dismiss, have retreated from their earlier, more absolute, position regarding the level of detail a pre-suit notice letter must present. Still, they overstate the notice burden the Clean Air Act, EPA's regulations and case law place on would-be plaintiffs.

In fact, a notice letter need not identify every detail of an alleged violation; it must only provide sufficient information so that the recipient can identify those details.  The EPA has promulgated regulations establishing content requirements for notice letters for citizen suits:

> Notices to…alleged violators regarding violation of an emission standard or limitation or an order issued with respect to an emission standard or limitation, shall include sufficient information *to permit the recipient to identify* the specific standard, limitation, or order which has allegedly been violated, the activity alleged to be in violation, the person or

persons responsible for the alleged violation, the location of
the alleged violation, the date or dates of such violation, and
the full name and address of the person giving the notice.

40 C.F.R. § 54.3(b) (emphasis added).[3]  The plain language of the regulation makes clear

that a citizen need not necessarily identify, as Defendants argue, specific dates of

violation or specific activities giving rise to violations, so long as the letter provides

information from which the recipient can identify the alleged violations, dates, and

activity at issue.  Courts have accordingly held that a notice letter is sufficient so long as

it provides enough information "to enable the recipients to identify the specific standard,

limitation, or order at issue and the dates on which the alleged violations occurred."

*Sierra Club v. Tri-State Generation and Transmission Ass'n., Inc.*, 173 F.R.D. 275, 283

(Dist. Colo. 1997).

The Third Circuit applied the regulation's plain language in rejecting the argument

that an identical notice requirement under the Clean Water Act required a citizen to

identify the specific standard, limitation or order alleged to have been violated, the

specific activity that constituted a violation, or every date on which a violation occurred.

*P.I.R.G. of New Jersey v. Hercules, Inc.*, 50 F.3d 1239, 1247 (3rd Cir. 1995).  In the

Third Circuit's view in *Hercules*, because "such specificity is not mandated by the

regulation," a citizen need not "identify every detail of a violation," so long as the notice

includes "sufficient information to *permit the recipient to identify* the components of an

alleged violation."  *Id.* (emphasis in original).  Along similar lines, in *Fried v. Sungard*

---

[3]        Defendants correctly note, as have many courts, given to the similarity in the notice requirements of federal
environmental laws such as the Clean Water Act and the Resource Conservation and Recovery Act, cases analyzing
the notice requirement under those laws are relevant here.

*Recovery Services, Inc.*, 900 F. Supp. 758, 765 (E.D. Penn. 1995), the court found the

following notice letter language to be sufficient:

> [Recipient] violated The Clean Air Act by repeatedly
> conducting renovations at 401 N. Broad Street, Philadelphia,
> PA 19106 in violation of the National Emissions Standard for
> Asbestos.  These violations occurred repeatedly between
> 1990 and 1994 and are continuing.

The court in *Fried* held that although the notice letter "barely" passed muster, it

provided sufficient notice, because it "provides enough information for the

recipient to identify the specific standard allegedly violated," and, although the

letter provided "a very general range of dates," it "limits the alleged violations to a

discrete period of time."  *Id.  See also Hudson Riverkeeper Fund, Inc. v. Putnam

Hospital Center, Inc.*, 891 F. Supp. 152, 154 (S.D.N.Y. 1995)("the specific dates

[of violations] need not themselves be included in the letter"); *and see Defenders

of Wildlife v. Ballard*, 73 F. Supp. 2d 1094, 1097 (D. Ariz 1999).

This Court (Beaumont Division) acknowledged the value of a less stringent

approach to the notice requirement in *Friends of the Earth v. Chevron Chemical*,

900 F. Supp. 67 (E.D. Tex. 1995).  After noting that "some undesirable side-

effects" come with "strictly applying" the notice requirement, this Court noted the

value of a "considered and balanced approach" and endorsed the pragmatic

approach of the Third Circuit in *Hercules*, under which the plaintiff must give

notice that is sufficient to "*enable the recipient*" to identify the parameter that was

violated and the dates of the violation."  *Id.* at 77. (emphasis added).  This is in

keeping with the thinking of most courts on the level of detail a pre-suit notice

must provide.  *Chevron Chemical* cited *Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 652 F. Supp. 620, 628 (D. Md. 1987)(adopting "pragmatic" approach to notice and allowing claims in amended complaint that weren't noticed to proceed because they were similar to claims that were noticed)); another similar case is *Susquehanna Valley Alliance v. Three Mile Island*, 619 F.2d 231, 243 (3rd Cir. 1980) (rejecting "excessively formalistic" approach to notice requirement and allowing actual notice to suffice).

The stringent approach to notice proffered by Defendants has negative practical consequences.  Under Defendants' approach, for example, additional instances of a violation revealed through discovery could only be addressed, if Plaintiffs sent new notice.  Such an emphasis on formalistic requirements would yield perverse results as a matter of pragmatism and judicial economy. Defendants' interpretation also conflicts with Congress' express intent, in the citizen suit context, to strike a balance in the notice requirement "between providing notice to recipients with sufficient information to identify the basis of the citizen's claim and not placing an undue burden on the citizen." *Hercules*, 50 F.3d at 1246.  Requiring the level of notice suggested by Defendants would in many cases substantially burden citizen plaintiffs.

Plaintiffs' Notice Letter provided adequate information to enable Defendants to identify the factors that EPA has determined, 40 CFR §54.3(b), a potential defendant needs to be able to identify.

Defendants argue that the Notice Letter failed to adequately help Defendants identify the activity alleged to be in violation. (Defendants' Motion, at 16). Plaintiffs' Notice Letter alleges that Defendants operated the Welsh Plant in such a manner as to generate excessive emissions of CO from the Unit No. 2 exhaust stack. It was this operation that was the activity. As a practical matter, the owner or operator of a power plant does not need to be told that it burned some hydrocarbon fuel (coal, in this case) in its boiler and the burning released carbon as a byproduct and some of the carbon combined with oxygen from the air to form CO and that this CO traveled up the exhaust stack and into the ambient air. No other activity could possibly be implicated, so Defendants cannot credibly argue that they were unaware of the specific activity that caused the alleged violations.

Defendants fault Plaintiffs' Notice Letter for failing to provide "data upon which the allegation is based." Defendants' Motion, at 16. There is no requirement, and Defendants certainly cite to none, for presentation of such data.

Finally, Defendants argue that the Notice Letter is insufficient because its statement of the dates of violation is too general to help Defendants identify dates of violation. A notice letter need not provide exact dates of alleged violations. *Defenders of Wildlife*, *supra,* 73 F. Supp. 2d at 1097; *Hudson Riverkeeper, supra,* 891 F. Supp. at 154. Indeed, "a very general range of dates" may suffice, so long as it "limits the alleged violations to a discrete period of time." *Fried, supra*, 900 F. Supp. at 765. Here, as in *Fried*, the Notice Letter limited the alleged violations for CO to a period of four years.

## Claim Five

Defendants allege three grounds for dismissal of Plaintiffs' Claim Five.  The first

two grounds allege jurisdictional infirmities, so these are R. 12(b)(1) grounds.  First, they

allege Claim Five should be dismissed, because Plaintiffs did not give Defendants pre-

suit notice of the claim.  See, Motion to Dismiss, § III.B. at p. 15.  Next, they allege the

fuel sulfur limitation is not a PSD permit limitation, so if, as Plaintiffs contend, there is

an exclusion to pre-suit notice requirement for PSD claims, the exclusion is unavailable

to insulate the claim from dismissal.  See, Motion to Dismiss, § III.D. at pp. 17-21.

Finally, Defendants assert a R. 12(b)(6) ground, which is a brief restatement of their their

second R. 12(b)(1) ground (i.e., that there is no PSD term limiting fuel sulfur content).

The first R. 12(b)(1) ground.  This ground for dismissal – that all citizen suit

claims, even one based on a violation of a PSD permit condition, are barred, in the

absence of a pre-suit notice – is not warranted by existing law, and Defendants make no

argument for reversal of existing law.  The citizen suit provision of the Clean Air Act, 42

U.S.C. § 7604, creates the private right of action in citizens to sue for various Clean Air

Act violations.  This right is set out in subsection (a), paragraphs (1), (2) and (3).  The

right is limited, however by a pre-suit notice requirement, but the limitation applies only

to the types of claims set out in paragraphs (a)(1) and (a)(2).  It is not so-limited, as to the

type of claim set out in paragraph (a)(3).  42 U.S.C. § 7604(b).  Plaintiffs' claim is that

Defendants violated a PSD permit condition, and that is one of the types of claims as to

which the right to suit is specifically created in subsection (a)(3) and not subsequently

limited by section (b).

Defendants have pointed to no legal precedent or made any interpretation of 42 U.S.C. § 7604(b) that would support a R. 12(b)(1) dismissal of a claim of violation of a PSD permit condition for wont of a pre-suit notice letter.  The only appellate decision Plaintiffs have found that directly addressed the issue is *United Steelworkers v. Oregon Steel Mills*, 322 F.3d 1222, 1227 (10th Cir. 2003), in which the court let stand the plaintiffs' suit, without pre-suit notice, for an alleged PSD violation, even though this ground for non-notice was raised for the first time on appeal.  There are several district court opinions supporting the absence of a pre-suit notice requirement for citizen suits alleging violations of PSD permit conditions; perhaps most interesting among these is *United States v. American Electric Power Service Corp.*, 137 F.Supp. 2d 1060, 1064-1065 (S.D. Ohio 2001), in which the court rejected the defendant's argument that the absence of a pre-suit notice requirement in subsection (b) was simply a drafting error or was, alternatively, a violation of the constitutional principle of separation of powers.

The second R. 12(b)(1) ground.  This ground for dismissal – that, although Plaintiffs allege Claim Five states a PSD permit term violation, the claim does not really do that – is more complicated.

First, note Plaintiffs plainly allege the violation of a fuel sulfur limit is a PSD permit term violation.[4]  This allegation seems eminently reasonable, given that – in addition to reasons elaborated upon, below – the permit is numbered 4381 and PSD-TX-3

---

[4]        From the Second Amended Complaint:

65.  Special Condition 6.A. of Defendant's PSD permit requires that fuel used in Welsh's boilers be limited to 0.5%-total-sulfur-by-weight. . . .

66.  Plaintiffs claim Defendants violated their PSD permit on the 244 days identified in Attachment O that post-date July 26, 2001, and on numerous later dates not now known to Plaintiffs.

and that sulfur dioxide is a criteria pollutant (thus, subject PSD permitting control).

The linchpin of Defendants' argument is two-fold: (1) only some terms in the permit are PSD terms, and (2) the fuel sulfur limit in the permit is not one of those PSD terms.

Defendants offer, condescendingly, a story about the evolution of the various permits Defendants have had into the present single permit Defendants themselves requested, but they offer no law to support their proposition that only some of the terms in the permit are PSD terms. They offer no credible means to differentiate the terms as either PSD or otherwise.

What is clear is that the present permit, Attachment A to Plaintiffs' Second Amended Complaint, has been labeled by the regulatory agency[5] as a single permit. (See, the bottom of the permit's first page, to the left of the signature of the Executive Director). It has been assigned a couple of numbers, but one of those is definitely "PSD-

---

[5]    Since 1992, TCEQ or its predecessor, TNRCC, has had full PSD permitting authority in Texas. Briefly, the history of how this came to pass is as follows. The PSD program was added to the federal Clean Air Act in 1977. Before that time, there had been no Clean Air Act provisions that specifically attempted to control deterioration of air quality in areas that were in compliance with the National Ambient Air Quality Standards. *Alabama Power Co.* v. *Costle*, 204 U.S. App. D.C. 51, 636 F.2d 323, 346-347 (CADC 1979). Sierra Club and others sued EPA in 1971 for failing to adopt regulations to fill this Clean Air Act gap, and EPA in 1974 adopted regulations requiring states to include PSD programs in their State Implementation Plans. 39 *Fed. Reg.* 42510 (1974). Three years later, Congress adopted the current PSD program. Pub. Law 95-95 (1977), generally codified at 42 U.S.C. §§ 7470-7491 (Part C of the Clean Air Act). The Congressional scheme was the same as had been EPA's: states were to amend their SIPs to include PSD programs, 42 U.S.C. § 7471, and, until the SIP amendments were approved, PSD permits would be issued by EPA under its regulations. 42 U.S.C. § 7478. EPA's regulations on what a state SIP had to contain, regarding PSD programs, to be approvable were and are set out at what is now 40 CFR § 51.166, and the federal PSD program, for the most part, was and is set out at what is now 40 CFR § 52.21.

       Most states, including Texas, incorporate by reference to their SIPs the bulk of 40 CFR § 52.21 and, thereby meet the standards of 40 CFR § 51.116 and, thereafter, implement SIP-approved PSD programs. Texas applied in 1980 only to review PSD applications and draft permits for EPA for Texas major stationary sources; Texas in those days acted, loosely speaking, as a contractor for EPA. This review-and-draft authority was granted by EPA in 1981. Later, in 1982, Texas gained authority to conduct compliance inspections for the PSD program in Texas. Later, still, Texas applied in 1987 and 1988 to take over the full PSD program – to issue and amend PSD permits and otherwise to enjoy the full authority enjoyed by EPA regarding PSD permits. 54 *Fed. Reg.* 52823-53826 (1989). EPA approved Texas's assumption of the PSD program in 1992, though EPA retained permit veto authority and continuing program oversight. 57 *Fed. Reg.* 28093-28098 (1992).

TX-3." Nowhere in the permit does it differentiate its terms as being PSD, on the one hand, and some other category of terms, on the other hand.

Defendants attached to their motion to dismiss three permits issued by TCEQ's predecessor in 1973 and 1976 and that Defendants characterize as the initial "state" permits for Units 1 (1973), 2 and 3 (both, 1976). Defendants also attached to their motion two letters (1976 and 1978) from EPA that Defendants characterize as, collectively, the initial PSD permit for Units 2 and 3. Defendants, next, argue that there was no fuel sulfur limitation in the 1976 and 1978 EPA letters, so a fuel sulfur limitation can not be a condition or requirement in a 1998 PSD permit.[6]

The problems with Defendants' argument are several-fold. First, the fuel sulfur limitation is also not in the state permits, either, so, that limitation cannot be "sourced" to the state permits.[7]

Second, Defendant SWEPCO represented in its 1976 PSD permit application materials submitted to EPA that it would use low-sulfur coal in all three units, and it further represented a maximum fuel sulfur content of 0.48% by weight. (See, the Frederick Affidavit attached to this response; it authenticates excerpts from permit application materials submitted by Defendant SWEPCO in 1976 and 1978.) Since the very first PSD regulations, EPA has had a regulation like what is now 40 CFR § 52.21(r)(1), which regulation makes federally enforceable the construction and

---

[6]     Defendants are not this explicit in their argument that the CO limit for Unit No. 2 is not a PSD permit term, but Plaintiffs believe the Defendants intend the same argument regarding both the CO and fuel sulfur limit.

[7]     Indeed, the state permits set out no limits, beyond incorporated NSPS limits and a 5-minute-averaged opacity limit.

operational representations one makes in permit application materials.[8] (Note that the very first of the standard conditions in the 1998 permit also provides that the permittee is bound by its application representations.) So, TCEQ's 1998 elevation of Defendant SWEPCO's commitment to a certain calibre of low-sulfur coal from the application materials to the text of the permit can not fairly be argued, as Defendants argue, to be a "later" alteration of the PSD permit making the permit more "stringent."

Finally and probably most importantly, Defendants have cited – and Plaintiffs are aware of – no law or regulation that prohibits the addition by regulators of terms to PSD permits, after those permits are initially issued. Defendants' motion cites one Clean Air Act section[9] and two regulatory sections[10] that say a major emitting facility, like the Welsh units, may not commence construction or be modified in a major way without undergoing BACT review, but nothing in these sections also purports to insulate the facility from the later tightening of permit conditions. (40 CFR § 52.21(j), one of the sections cited by Defendants, was not in 1998 and has never been part of the SIP-approved Texas PSD program, so it would not seem to have any relevance at all to Defendants' argument. See, 30 TAC §116.160(b)(1)(1998), now superseded.)

Defendants argument that TCEQ just did not have the authority to include in the 1998 permit PSD provisions not seen in the 1976 and 1978 EPA letters is disingenuous, when viewed against the background of events surrounding this permit. The 1998 permit

---

[8]     The initial incarnation of this regulation was codified at 40 CFR § 52.21(e)(2)(now, superseded), having been adopted at 39 Fed. Reg. 42517 (1974).

[9]     42 U.S.C. § 7475(a)(4).

[10]    40 CFR §§ 52.21(a)(2)(iii) and 52.21(j).

was a "consolidated" permit at Defendants' request; they are the ones that sought to have two PSD permits (4381/PSD-TX-3 and 4379/PSD-TX-899) and the Unit No. 1 state permit (1166) and two standard exemptions from permitting and three permit authorizations of other stripes "rolled in" together.  See, the TNRCC transmittal letter for the 1998 permit (also cited by Defendants, Motion, p. 18), which precedes the permit at Attachment A to Plaintiffs' Second Amended Complaint.  This same transmittal letter plainly told Defendants it set out new special conditions and an emission rates table; it plainly told the Defendants to carefully review the conditions of the permit.  Also among the "new" limitations in the permit was a more lenient PM hourly emission rate for Unit No. 2, a PSD permit relaxation that benefits Defendants and that they are certainly not disavowing. [11]   Defendants got the permit they asked for and, as noted in the preceding footnote, almost surely more than they were legally entitled to get; it is a little late to now for Defendants to create and invoke ambiguities in an attempt to escape the consequences of that permit.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court deny "Defendants' Motion To Dismiss Plaintiffs' Third and Fifth Claims for Relief and Brief in Support."

---

[11]      Plaintiffs do not believe that many of the terms that appear for the first time on the face of the permit are, in fact, "new" limitations; many – like the fuel sulfur limitation or the CO limitation, were application representations that were just being carried forward to the text of the permit for the first time.  **HOWEVER**, Plaintiffs **do** believe the more lenient PM hourly emission rate was a new and very-likely-not-legal permit term; compare the MAERT PM hourly limit in the 1998 permit to the 29 pounds/hour lower rate allowed by EPA in its 1976 letter.

Respectfully Submitted,

PUBLIC CITIZEN and SIERRA CLUB


By: /s/ David Frederick
DAVID O. FREDERICK
Attorney-in-Charge
Texas Bar No. 07412300
Lowerre and Frederick
44 East Avenue, Suite 100
Austin, TX 78701
(512) 469-6000
(512) 482-9346 (facsimile)

ILAN LEVIN
State Bar No. 00798328
Environmental Integrity Project
44 east Avenue, Suite 202
Austin, Texas 78701
(512) 619-7287

Counsel for Plaintiffs Public Citizen and the
Sierra Club

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 10, 2006, the foregoing response and memorandum of law was electronically served using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF Registrant indicated below.

**Stayton L. Worthington**
Coghlan, Crowson, Fitzpatrick, Westbrook & Worthington, LLP
1127 Judson Rd, Suite 211
P.O. Box 2665
Longview, TX 75606-2665
903/758-5543
903/753-6989 (fax)
bworthington@ccfww.com

/s/ David Frederick